UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| APRIL ARFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16 CV 259 ACL |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff April Arford brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Arford's severe physical and mental impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that existed in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I. Procedural History

Arford filed applications for DIB and SSI on November 14, 2013, claiming that she became unable to work on June 15, 2010, because of polyneuropathy, muscle deterioration and

nerve damage, neck pain, hypertension, and depression. (Tr. 10, 290.) Arford was 32 years of age at the time she filed her applications. *Id.* Her claims were denied initially. (Tr. 160-66.) Following an administrative hearing, Arford's claims were denied in a written opinion by an ALJ, dated November 19, 2015. (Tr. 10-23.) Arford then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 13, 2016. (Tr. 5, 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Arford first argues that "[s]ubstantial evidence on the record as a whole does not support the ALJ's finding that Arford can perform a wide range of light work." (Doc. 15 at 10.) She next claims that the ALJ "impermissibly drew his own inferences from the medical evidence." *Id.* at 13.

## II. The ALJ's Determination

The ALJ first noted that Arford had previously applied for disability benefits, and these applications were denied on December 11, 2012. (Tr. 10, 153-55.) The ALJ found no basis to reopen any of these prior applications. (Tr. 10.) He next found that Arford met the insured status requirements of the Social Security Act through September 30, 2013, and did not engage in substantial gainful activity since June 15, 2010, her alleged onset date. (Tr. 12.)

In addition, the ALJ concluded that Arford had the following severe impairments: degenerative disc disease (DDD) of the lumbar spine, status post fusion surgery at level L4-L5 in 2004; polyneuropathy; obesity; and depression. (Tr. 13.) The ALJ found that Arford did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. *Id.*

As to Arford's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as that term is defined in 20CFR404.1567(b) and 416.967(b) and SSR 83-10, except that the following nonexertional limitations reduce the claimant's capacity for light work; only occasionally climb ladders, ropes and scaffolds or stoop; and limited to jobs that involve understanding, remembering, and carrying out only simple instructions, and that involve no more than occasional contact with the public.

(Tr. 15.)

The ALJ found that Arford's allegations regarding the extent of her limitations were not entirely credible. (Tr. 16.) In determining Arford's RFC, the ALJ indicated that he was assigning "some weight" to the opinions of consultative psychologist Hester B. Samuel, and neurosurgeon Kee B. Park; and "substantial weight" to the opinions of State agency medical consultants. (Tr. 20-21.)

The ALJ further found that Arford was unable to perform past relevant work, but was capable of performing other jobs existing in the national economy, such as hospital products assembler, bindery machine feeder, and final inspector. (Tr. 22-23.) The ALJ therefore concluded that Arford was not under a disability, as defined in the Social Security Act, from June 15, 2010 through the date of the decision. (Tr. 23.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on November 14, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income protectively filed on November 14, 2013, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

### III. Applicable Law

### III.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

   1. The credibility findings made by the ALJ.

   2. The plaintiff's vocational factors.

   3. The medical evidence from treating and consulting physicians.

   4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

   5. Any corroboration by third parties of the plaintiff's impairments.

   6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B. Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists … in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security

Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless

of age, education, and work experience.  20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).  "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations."  *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).  The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R. § 416.945(a)(3).  The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.  *See id.*  If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.  *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience.  *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000).  The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the

national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the

appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Arford challenges the ALJ's RFC determination and the ALJ's evaluation of the medical opinion evidence in determining Arford's RFC.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of his limitations. *Dunahoo v. Apfel,* 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001); *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer,* 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).

Arford first argues that the ALJ's RFC determination is not supported by substantial evidence because the record shows that she is not capable of the prolonged standing and walking required for light work, that is six hours out of an eight-hour work day. (Doc. 15 at 10-13.) Arford points to her testimony that she quit working in June 2010 due to her inability to stand for prolonged periods, and that she could only stand for about 15-30 minutes at a time, and could only

walk about 15-20 minutes before she has to sit down due to the polyneuropathy in her feet. (Tr. 62-63, 66-70.) Arford argues that the medical evidence supports these limitations.

The ALJ provided a detailed summary of the objective medical evidence. (Tr. 17-20.) He first discussed the fact that Arford underwent lumbar spine surgery in April of 2004 for a laminectomy, microdiscectomy and fusion at level L5-S1, due to discogenic pain she experienced after a February 2004 lifting injury. (Tr. 17, 388, 415.) Arford's neurosurgeon, Dr. Park, found in July of 2004 that the fusion appeared stable. (Tr. 17, 549.) During a follow-up in October of 2005, Dr. Park noted that Arford had done very well following her lumbar surgery, but that she was now complaining of "some vague pain involving the lower back and her midback." (Tr. 17, 550.) Dr. Park stated that he was "unable to determine the source of these symptoms," and referred Arford to a pain management physician—Dr. Steven Soeter. *Id.* The ALJ pointed out that there is no evidence in the record that Arford ever followed-up on this referral. (Tr. 17.)

The ALJ stated that in February of 2010, a few months prior to her alleged disability onset date, Arford saw primary care physician Joseph B. Pierce, M.D., for treatment of back pain and depression. (Tr. 17, 609-16.) She also complained of right foot pain due to kicking a door the week prior. (Tr. 613.) Upon examination, Arford's gait was normal, she was able to undergo exercise testing, and she had normal range of motion and strength in the lower extremity other than swelling in the right foot. (Tr. 614-15.) No depression, anxiety, or agitation was observed on mental status exam. (Tr. 615, 611.) Dr. Arford prescribed Hydrocodone[1] and Soma.[2] *Id.*

The ALJ noted the record reflects a lengthy gap of no treatment until Arford followed up

---

[1]Hydrocodone contains a combination of an opioid (narcotic) pain reliever—hydrocodone—and a non-opioid pain reliever—acetaminophen. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).

[2]Soma is indicated for the treatment of muscle pain. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).

with Dr. Pierce in April of 2012. (Tr. 18, 637-40.) At that time, Arford complained of significant pain and numbness in the toes of her right foot that had started one year prior. (Tr. 18, 637.) Upon examination, Dr. Pierce noted Arford's gait was "waddling," she had paravertebral spasm, and a positive straight leg raise at 40 degrees bilaterally; but normal range of motion and strength of the lower extremities, intact sensation, and normal strength and tone. (Tr. 18, 638-39.) Dr. Pierce noted Arford's mood was depressed on mental status exam. (Tr. 18, 639.) He listed "neuropathy" as a new problem for which he prescribed Neurontin;[3] he also noted existing problems of foot pain, hyperlipidemia, neck pain, back pain, gastroesophageal reflux disease ("GERD"), and hypertension. *Id.* In September 2012, Arford continued to complain of neuropathy; Dr. Pierce prescribed Lyrica.[4] (Tr. 18, 655.) In April 2013, Arford reported continued pain in her legs and feet and indicated that she preferred not to take the Hydrocodone. (Tr. 18, 641.) On examination, Dr. Pierce noted that Arford was morbidly obese and waddled. *Id.* In July 2013, Arford reported some slight improvement in the pain in her legs, although she still experienced numbness. (Tr. 18, 658.) On examination, Dr. Pierce noted decreased neck flexion, paravertebral spasm, and normal range of motion and strength. (Tr. 660.) Dr. Pierce also found that Arford was depressed on mental status exam. *Id.* He diagnosed muscle spasm and lumber radiculopathy as new problems. *Id.* Dr. Pierce administered a Depo-Medrol injection into Arford's left deltoid for the lumbar radiculopathy; and prescribed Cymbalta[5] for her depression. *Id.*

The ALJ pointed out that, despite Dr. Pierce's diagnosis of lumbar radiculopathy, an MRI

---

[3]Neurontin is indicated for the treatment of nerve pain. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).
[4]Lyrica is indicated for the treatment of pain caused by nerve damage. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).
[5]Cymbalta is indicated for the treatment of depression and anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).

Arford underwent two days later, July 11, 2013, revealed a normal postoperative appearance at L5-S1, with no findings at the other levels.  (Tr. 18, 649-50.)

Arford saw neurologist Mario Cauli, M.D., upon the referral of Dr. Pierce, on September 6, 2013.  (Tr. 18, 685.)  Arford complained of numbness and tingling in both feet for one year that had been worsening.  *Id.*  She reported her chronic lower back pain had mildly improved with her 2004 surgery.  *Id.*  Upon examination, Arford's gait was normal, and her neurological and mental status exams were normal.  (Tr. 686-87.)  Dr. Cauli diagnosed Arford with anxiety/depression, lumbar back pain, pain in limb, and paresthesia.  (Tr. 687.)  He prescribed Lyrica and Cymbalta.  *Id.*  Dr. Cauli performed nerve conduction studies and an EMG of the bilateral lower extremities, which revealed no electrophysiological evidence of myopathy or radiculopathy; but evidence of moderate to severe sensory polyneuropathy, left greater than the right.  (Tr. 689.)

Arford presented to Rickey L. McGrath, M.D., to establish care as her new primary care physician in February of 2014.  (Tr. 18, 712-15.)  Arford complained of burning and tingling in her feet and ankles that was better when she takes Lyrica.  (Tr. 712.)  She also reported chronic low back pain, GERD, and generalized anxiety disorder with depression.  *Id.*  On examination, Dr. McGrath noted decreased sensation in her feet and lower ankles; tenderness in the lumbar spine; and pain with flexion beyond 30 degrees; she also had a flat affect and somewhat depressed mood without suicidal or homicidal ideation.  (Tr. 713.)  Dr. McGrath adjusted Arford's medications.  *Id.*

Arford starting seeing pain management specialist Benjamin H. Soeter, M.D., in March of 2014, upon the referral of Dr. McGrath.  (Tr. 19, 727.)  Upon examination, Dr. Soeter noted decreased sensation of the bilateral feet, motor strength of 4/5, negative straight leg raise test,

diffuse tenderness to palpation of the low back, and tender points in the neck area. (Tr. 728.) Dr. Soeter diagnosed Arford with peripheral neuropathy, enthesopathy[6] of the neck, apparent lower extremity radiculopathy, and postlaminectomy syndrome. *Id.* He recommended an MRI, trigger point injections, an increased dosage of Neurontin, and an evaluation for a stimulator trial for peripheral neuropathy. *Id.* The ALJ noted that Dr. Soeter continued treating Arford for her pain and neuropathy symptoms through at least October 5, 2015 with lumbar steroid injections, medication, and an epidural stimulator trial. (Tr. 19, 766-75.)

Arford starting seeing Philma B. Opinaldo, M.D., instead of Dr. McGrath as her primary care physician in May of 2014, for her back and leg impairments. (Tr. 19, 756.) On Arford's last documented visit, on October 17, 2014, she complained of numbness in the fingers of her right hand. (Tr. 747.) Dr. Opinaldo assessed "probable carpal tunnel syndrome on the right." (Tr. 749.) He advised her to try using a right wrist splint and heating pad, and refilled her pain medications. (Tr. 19, 750.) The ALJ noted that a diagnosis of carpal tunnel syndrome has not been established by the medical evidence of record, nor was there evidence that this condition has existed for twelve continuous months. (Tr. 19.)

As to Arford's mental impairments, the ALJ noted that Arford underwent a consultative psychological evaluation performed by Hester B. Samuel, Ph.D. on November 12, 2013. (Tr. 19, 693-700.) Arford reported sadness about her health decline but did not report a history of suicidal ideations or intent. (Tr. 693.) She indicated that she noticed increased frustration and irritability when she was not taking Sertraline,[7] but did not report clinical anxiety disorder symptoms. *Id.*

---

[6]A disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules. *Stedman's Medical Dictionary* 1729 (27th ed. 2000).

[7]Sertraline, or Zoloft, is indicated for the treatment of depression and anxiety. *See* WebMD, http://www.webmd.com/drugs (last visited February 12, 2018).

Dr. Samuel stated that Arford's mental health treatment history consisted solely of seeing her primary care physician for the past two years and being prescribed Sertraline for irritability. (Tr. 694.) Dr. Samuel noted Arford had no history of problems relating to interacting with others on the job. (Tr. 695.) Upon mental status examination, Arford was appropriately dressed and groomed, her hygiene was good, she did not display any pain indicators, her attitude was good and cooperative, her mood was not depressed or anxious, her affect was appropriate, no abnormalities of speech were noted, and her thought content was normal. (Tr. 695-97.) Dr. Samuel diagnosed Arford with pain disorder associated with both medical and psychological factors, depressive disorder NOS, and a GAF score of 52.[8] (Tr. 698-99.) Dr. Samuel found that Arford was able to tend to her self-care needs; communicate and interact in a socially adequate manner; communicate in an intelligible and effective manner; cope with the typical mental demands of basic school or work-like tasks; attend and sustain concentration on basic tasks; sustain persistence in completing tasks; and complete school or work-like tasks within an acceptable timeframe, as long as tasks do not exacerbate her pain issues. (Tr. 699-700.)

The ALJ concluded that Arford has functional limitations resulting from her impairments, but her allegation of disability was not credible. (Tr. 20.) He found that Arford is limited to work at the light level of physical exertion due to the combination of her DDD, peripheral neuropathy, and obesity, which also accounts for her postural limitations. *Id.* The ALJ further found that Arford's mental limitations restrict her to jobs that involve understanding,

---

[8] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("DSM IV–TR").

remembering, and carrying out only simple instructions with no more than occasional contact with the public due to her symptoms from severe depression and nonsevere anxiety. *Id.*

In determining Arford's RFC, the ALJ also performed a credibility analysis and found her allegations were not entirely credible. Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005). Credibility questions are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003).

The ALJ first noted that Arford's alleged extreme limitations in lifting, sitting, and standing, yet her daily activities was unsupported by the medical evidence of record. (Tr. 20.) An ALJ may consider the lack of objective medical evidence supporting a plaintiff's subjective complaints as one factor in assessing credibility. *Forte v. Barnhart,* 377 F.3d 892, 895 (8th Cir. 2004). Although some medical evidence in the record supports Arford's complaints of pain, the medical evidence as a whole belies Arford's allegations to the extent she claims disabling limitations. Notably, Arford's July 2013 MRI was normal, EMG testing revealed no evidence of radiculopathy, and her neurologic examinations were normal. (Tr. 18, 649-50, 686-87, 689.) The ALJ also noted there were gaps in Arford's treatment after her alleged onset date: from March 2011 to April 2012, and from January 2015 to August 2015. (Tr. 18.)

The ALJ also found Arford's daily activities were inconsistent with her testimony regarding extreme limitations. Arford testified that that she was only able to sit and stand for 15 to 30 minutes, was able to walk for 15 to 20 minutes, and was "not really" able to lift any amount of weight. (Tr. 69.) The ALJ found that Arford's testimony regarding her limitations was inconsistent with her testimony that she drives 20 to 30 miles a week. (Tr. 20, 64.) He further found her testimony that she has difficulty with concentration and memory inconsistent with the

fact that she was taking four online college classes at the time of the hearing and had earned As and Bs in her previous semester of classes. (Tr. 20, 69-70, 76.) Arford also reported that she prepared meals, watched television, did homework, played video games, took care of pets, did laundry, washed dishes, and shopped for groceries. (Tr. 71, 309-13.) The ALJ concluded that the overall evidence shows that if Arford's medical and psychological conditions were disabling, her activities would be more severely restricted. (Tr. 20.) While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Arford's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in assessing her credibility. *See Eichelberger*, 390 F.3d at 590 (holding that the ALJ properly considered that claimant watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible).

The ALJ next stated that Arford's work history during the 15 year period prior to her alleged onset date was steady, but she only worked at the substantial gainful activity level in 4 of those 15 years. (Tr. 20, 252-53.) He found that her inconsistent work history suggests a lack of motivation to work, and that her underemployment and recent unemployment is related to non-disability factors. *Id.* A poor work history lessens a claimant's credibility. *See Fredrickson v. Barnhart,* 359 F.3d 972, 976-77 (8th Cir. 2004) (holding that claimant was properly discredited due, in part, to her sporadic work record reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work).

As to the opinion evidence, the ALJ first noted that he was giving "some weight" to the February 2004 opinion of Dr. Park that Arford was limited to lifting no more than 20 pounds and could not bend or twist. (Tr. 20, 531.) The ALJ acknowledged that Dr. Arford imposed this restriction more than 6 years prior to Arford's alleged onset date and expressly stated that these

restrictions were only effective until March 2, 2004.   (Tr. 21.)

The ALJ indicated that he was assigning "substantial weight" to the opinions of the state agency medical consultants—Ronald Crow, D.O., and Mel Moore, M.D.—regarding Arford's physical limitations.   (Tr. 21.)   On January 9, 2014, Dr. Crow completed a Physical Residual Functional Capacity Assessment, in which he expressed the opinion that Arford could occasionally lift and carry 20 pounds and frequently lift or carry 10 pounds; stand or walk 6 hours in an 8-hour workday; and sit for 6 hours in an 8-hour workday.   (Tr. 104-05.)   On May 21, 2014, Dr. Moore found that Arford had the same exertional limitations as found by Dr. Crow, but imposed the additional postural limitation of only occasional climbing ladders, ropes, or scaffolds; and occasional stooping.   (Tr. 145.)   The ALJ indicated that he was assigning more weight to Dr. Moore's opinion, as he had the opportunity to review updated medical records.   (Tr. 21.)

As to Arford's mental limitations, the ALJ indicated he was giving "substantial weight" to the opinion of State agency psychological consultant Sheri Simon, Ph.D., and Joan Singer, Ph.D. (Tr. 21.)   On January 9, 2014, Dr. Simon expressed the opinion that Arford was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and in her ability to accept instructions and respond appropriately to criticism from supervisors.   (Tr. 107.)   On May 20, 2014, Dr. Singer found that Arford had the additional moderate limitation in her ability to work in coordination with or in proximity to others without being distracted by them.   (Tr. 147.)

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'"   *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).   The opinion of a

treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011).

Arford's second argument is that "the ALJ impermissibly drew his own inferences from the medical evidence." (Doc. 15 at 13.) Specifically, she argues that the ALJ erred in relying on the opinions of non-examining State agency consultants, and the ALJ should have further developed the record by obtaining an opinion from a treating or consultative physician regarding her physical work-related limitations.[9] *Id.* at 13-15.

The ALJ is only required to order further medical examinations where a "critical issue is undeveloped" and the existing medical record does not provide "sufficient medical evidence to determine whether the claimant is disabled." *Martise*, 641 F.3d at 926-27. In this case, Arford has not established that such an issue is underdeveloped.

The undersigned finds that substantial evidence on the record as a whole supports the ALJ's RFC decision. *See Buford v. Colvin*, 824 F.3d 793, 796-97 (8th Cir. 2016) (ALJ did not err in failing to obtain an opinion from a treating or consultative doctor where RFC was based on State agency medical consultants' assessments and claimant's medical records that showed examination and treatment by various medical providers over a two-year period). Drs. Crow and Moore both found that Arford was capable of performing a range of light work. They reviewed the medical record of evidence, including the treatment notes of Arford's treating and examining physicians,

---

[9] Arford does not challenge the ALJ's determination as to her mental RFC, and the undersigned finds that this determination is supported by substantial evidence.

which noted some improvement of her neuropathy in the lower extremities with medication, a gait within normal limits, and intact strength and sensation. (Tr. 106, 146.) The State agency physicians indicated that findings on examination have typically been normal, other than a waddling gait, which can be attributed to Arford's obesity. (Tr. 146.) They also reviewed the records from imaging, including a CT scan and MRI of the cervical spine in 2008 revealing reversal of the normal lordotic curvature of the cervical spine and degenerative changes; the 2013 normal MRI of the lumbar spine; and the nerve conduction studies and EMG revealing no evidence of myopathy or radiculopathy, but evidence of moderate to severe sensory polyneuropathy. *Id.* Their opinions constitute medical evidence supporting the ALJ's decision. *See* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (State agency medical consultants are highly qualified experts in Social Security disability evaluation; therefore, ALJs must consider their findings as opinion evidence.).

In sum, the ALJ did not err in assigning weight to the opinions of the State agency physicians. The ALJ assessed Arford's physical RFC based on the treatment notes of Arford's physicians, the objective imaging, and Arford's testimony. The ALJ performed a proper credibility determination and found Arford's allegations of total disability were not entirely credible. Arford did not meet her burden to establish a more restrictive RFC. The record, when considered as a whole, supports a conclusion that Arford is capable of performing a limited range of light work. The fact that the record might also support a contrary conclusion is not a basis for reversing the ALJ's decision in this case. *See Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016); *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

The hypothetical question the ALJ posed to the vocational expert was based on the RFC formulated by the ALJ, which accounted for all of Arford's credible limitations. Consequently,

the hypothetical question posed to the ALJ was proper. *See Martise,* 641 F.3d at 927 ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006)).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of March, 2018.